

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-19-2006

# Morrison v. Madison Dearborn Cap

Precedential or Non-Precedential: Precedential

Docket No. 05-4901

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Morrison v. Madison Dearborn Cap" (2006). *2006 Decisions.* Paper 391.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/391

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-4901

———

LARRY MORRISON,
                        Appellant

v.

MADISON DEARBORN CAPITAL PARTNERS III L.P.;
MADISON DEARBORN SPECIAL EQUITY III L.P.;
MADISON DEARBORN PARTNERS III L.P.;
MADISON DEARBORN PARTNERS LLC;
XM SATELLITE RADIO HOLDINGS INC.

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 04-cv-00010)
District Judge: Honorable Kent Jordan

———

Submitted Under Third Circuit LAR 34.1(a)
September 14, 2006

Before: SLOVITER, WEIS, and GARTH, Circuit Judges

(Filed : September 19, 2006)

———

Jeffrey S. Abraham, Esq.

Mitchell M. Twersky, Esq.
Abraham Fruchter & Twersky LLP
One Pennsylvania Plaza
Suite 1910
New York, New York 10119

Attorneys for Appellant

Michael R. Robinson, Esq.
Lisa A. Schmidt, Esq.
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19801

James A. Langan, Esq.
Kathryn F. Taylor, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Suite 6500
Chicago, IL 60601

Attorneys for Madison Dearborn Capital Partners III, L.P., Madison Dearborn Special Equity III, L.P., Madison Dearborn Partners III, L.P., and Madison Dearborn Partners, LLC

John C. Keeney, Jr., Esq.
Hogan & Hartson LLP
555 13th Street, N.W.
Washington, DC 20004

Carolyn S. Hake, Esq.
Ashby & Geddes
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, DE 19899

Attorneys for XM Satellite Radio Holdings, Inc.

2

SLOVITER, <u>Circuit Judge</u>.

**I.**

Larry Morrison, a shareholder of XM Satellite Radio Holdings, Inc. ("XM"), brought a derivative suit under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), to recover alleged short-swing profits realized by corporate insiders Madison Dearborn Capital Partners III, L.P, Madison Dearborn Special Equity III, L.P., Madison Dearborn Partners III, L.P., and Madison Dearborn Partners, LLC (collectively "Madison Dearborn"). The District Court dismissed the complaint for failure to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). Morrison appeals.

**II.**

In August 2000, Madison Dearborn purchased 50,000 shares of "8.25% Series C Convertible Redeemable Preferred Stock Due 2012" (hereinafter "Preferred Stock") issued by XM for $1000 per share. Combined with other purchases, Madison Dearborn was the beneficial owner of 13.58% of the underlying XM Common Stock.

Holders of Preferred Stock are entitled to exchange their shares for XM Common Stock. The Certificate of Designation for the Preferred Stock set the conversion price at $26.50 per share, but also contained "anti-dilution" provisions which automatically decreased the conversion price when certain events occurred, such as a stock split, payment of dividends, or issuance of additional Common Stock. By 2003, the conversion price had decreased to $19.68. On and subsequent to January 28, 2003, XM issued additional Common Stock, which further reduced the conversion price to $8.96 per share as of June 30, 2003. Prior to the adjustment, Madison Dearborn was entitled to convert its Preferred Stock into 2,540,650 shares of Common Stock. Afterwards, it was entitled to 5,580,357 shares but never exercised its right to convert those shares.

3

In June 2003, Madison Dearborn sold 2,674,154 shares of XM Common Stock that it had acquired independently of the Preferred Stock. Morrison requested that XM bring suit against Madison Dearborn to recover the alleged short-swing profits realized by this sale. When XM declined to do so, Morrison brought this derivative shareholder lawsuit.

## III.

The District Court had jurisdiction over this action under 15 U.S.C. § 78aa. We have jurisdiction over this appeal from the final judgment of the District Court under 28 U.S.C. § 1291. We exercise plenary review over the order dismissing the complaint, as well as the District Court's interpretation of securities law. In re Rockefeller Ctr. Properties, Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002). When reviewing a motion to dismiss, "we accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff[ ]." In re IT Group, Inc., 448 F.3d 661, 667 (3d Cir. 2006).

## IV.

Section 16(b) of the Securities Exchange Act of 1934 prohibits corporate insiders from using their privileged position to profit from short-term transactions in the company's stock. 15 U.S.C. § 78p(b).[1] Short-swing trading is a strict-liability offense

_____

[1]Section 16(b) provides, in pertinent part:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of the issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . . **This subsection shall not be construed to cover . . . any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended**

and does not require proof of actual abuse of insider information or an intent to profit from such information.  <u>Foremost-McKesson, Inc. v. Provident Sec. Co.</u>, 423 U.S. 232, 251 (1976).  The plaintiff need only prove that "'there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six month period.'"  <u>Levy v. Sterling Holding Co.</u>, 314 F.3d 106, 111 (3d Cir. 2002) (quoting <u>Gwozdinksy v. Zell/Chilmark Fund, L.P.</u>, 156 F.3d 305, 308 (2d Cir. 1998)).  For the purposes of the motion to dismiss, Madison Dearborn does not dispute that it is a corporate insider or that it sold almost 2.7 million shares of XM Common Stock in June 2003.  The only issue is whether the automatic adjustment to the conversion price of the Preferred Stock in January 2003, was a "purchase" of securities.

The Securities Exchange Act of 1934 authorizes the SEC to enact regulations defining which transactions are included in the ban on short-swing trading and which are "exempt as not comprehended within the purpose of this subsection."  15 U.S.C. § 78p(b).  In 1991, the SEC adopted new regulations on the applicability of Section 16(b) to transactions in derivative securities.  A derivative security is "any option, warrant, *convertible security*, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security . . . ."  17 C.F.R. § 240.16a-1(c) (emphasis added).

The parties agree that, because the Preferred Stock is convertible into Common Stock, the Preferred Stock is a derivative security.  More specifically, the Preferred Stock is a "call equivalent position," because it "increases in value as the value of the underlying equity increases . . . ."  17 C.F.R. § 240.16a-1(b).  The regulations state that "[t]he establishment of or an increase in a call equivalent position . . . shall be deemed a purchase of the underlying security for purposes of section 16(b)

---

**within the purpose of this subsection.**

15 U.S.C. § 78p(b) (2006) (emphasis added).

5

. . . ." 17 C.F.R. § 240.16b-6(a). Morrison argues that the adjustment in the conversion price increased Madison Dearborn's call equivalent position from 2,540,650 shares to 5,580,357 shares of XM Common Stock. Thus, he argues, under the plain meaning of the regulations, the adjustment constituted a "purchase."

Morrison's argument is contrary to the SEC's interpretation of the regulations. An agency's reasonable interpretation of its own regulations "attracts substantial judicial deference." United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 219 (2001) (citation omitted). "Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation marks omitted). Deference is especially warranted when the regulations concern "a complex and highly technical regulatory program[.]" Id. (internal quotation marks omitted). Particular weight is given to agency interpretations made at the time the regulations are promulgated. Gardebring v. Jenkins, 485 U.S. 415, 430 (1988).

The SEC anticipated, and rejected, Morrison's argument. In the release announcing the new regulations, the SEC states that the regulations only apply to derivatives with a "fixed exercise price." Ownership Reports and Trading By Officers, Directors and Principal Security Holders, 56 Fed. Reg. 7242, 7252 (Feb. 21, 1991) (hereinafter "Release"). The Release clarifies what constitutes a "fixed" price, saying,

> A convertible security with a fixed conversion privilege is deemed to have a fixed exercise price. A derivative security having a series of preset prices, or having a price that is adjusted to reflect pre-specified events such as a stock split, is considered fixed for purposes of the Rule. *The adjustments for pre-specified events do not constitute acquisitions of additional equity securities.*

Release, at 7252 n.134 (emphasis added). Therefore, under the

SEC's interpretation, the adjustment to the conversion price of the Preferred Stock is not a "purchase."

The SEC's interpretation is consistent with the statutory purpose. The ban on short-swing trading was enacted "[f]or the purpose of preventing the unfair use of information which may have been obtained by [corporate insiders.]" 15 U.S.C. § 78p(b). The SEC has attempted to identify those transactions which have a "potential for abuse." Release, at 7249. The potential for abuse is minimal when the adjustments are automatic, and the triggering events were specified at the time when the stock was purchased. The shareholder cannot control when, or even if, the adjustment occurs. Cf. Lerner v. Millenco, L.P., 23 F. Supp. 2d 337, 343 (S.D.N.Y. 1998) (holding that a shareholder *had* purchased additional securities by negotiating with the company to reduce the conversion price of convertible debentures). While the possibility of insider trading is not entirely eliminated, it is not so great as to impose strict liability as provided in Section 16(b).

## V.

We defer to the SEC's reasonable position that an automatic adjustment to the conversion price of a derivative security is not a "purchase" for the purposes of Section 16(b). The District Court fully considered Morrison's arguments before rejecting his arguments that the increase in the conversion ratio subjected Madison Dearborn to liability under Section 16(b). Therefore, we will affirm the decision of the District Court to dismiss the complaint.

———————————————